For two reasons, the district court erred in entering summary judgment in favor of DCS. First, when the facts are viewed favorably to the Jergers, as they of course must be at present, they were repeatedly instructed that they had no choice but to submit J.J. for a blood draw, and when they attempted to push back even a little, were told that if they did not do so, they would lose custody of their child. This is submission to a claim of lawful authority within the meaning of Shnuckoth and Bumper and is not voluntary consent to a Fourth Amendment search. Second, that issue was sought- Where does the record show that they were told that they would lose custody as opposed to there would be a Chins proceeding filed? Ms. Jerger's testimony is abundantly clear. She was told that J.J. would become a child in need of services. Yes, but that's different from losing custody. I don't think that is different, Your Honor. It's presupposing the outcome of the proceeding, not saying that we're going to go to court. That is one outcome of the proceedings, but I'm asking if it is clear in this record that the statement was made, you will lose custody if we file a Chins proceeding. The statement, we'll lose custody, was not uttered. Indeed. So, as I understand it, the statement was, we will file a Chins proceeding. That's not true, Your Honor. Did Layla testify, though, that Garrett told them if they refused to sign, that J.J. would become a child in need of services? That is exactly what the record reflects, and that is more than saying, we're going to go to court and see what a judge does. That is saying the outcome of the proceeding is preordained. No, I don't understand that at all. All the state can do is commence the proceeding and ask for relief, and the judge decides what to do. Did they suggest, no, we've got this judge in our pocket, and he does whatever we ask? Your Honor, this court is a result of a variety of recent— You see, I hope you understand why I'm asking this. I do. Of course, I apologize, Your Honor. The parallel is, the police show up at somebody's door and say, we would like you to consent to a search, and the homeowner says, no, I don't want to, and the police say, that's fine, but if you don't consent, we will go and get a warrant. The homeowner then says, okay, I consent. We've had a series of those cases, and the holding is always, that's a perfectly valid consent, because the alternative threat to go and get a warrant is itself valid. Respectfully, Your Honor, I don't think that is the proper parallel. I think the parallel is the police showing up and not just saying, we're going to seek a warrant, not just saying a judge is going to sign a warrant, but the police showing up and saying that if you do not consent, you are going to be convicted. Now, obviously, I'm familiar that this— Look, I can't see anything like that. Could you give me exactly what the record shows the words were? Right? We've moved from, you'll lose custody, to now you'll be convicted. J.J. would become a child in need of service. Exactly. That's what it means to commence the proceeding in Indiana. Your Honor, that's not what it means to commence the proceeding. A petition alleging someone to be a Chinz is exactly that. It's a complaint saying that this is the case that we think we're going to prove. So in other words, when the proceeding is filed, the outcome might be, no, this child is perfectly okay, or the outcome might be, this is a child in need of services, but Layla was told she would become a child in need of services, and thus, in varying ways, under the control of the Indiana Department. That's absolutely correct, Your Honor. Whether she stayed at home, whether she was put in a foster home, whether other things happened is to be determined. And I think there's a way- Their parenting would be now supervised by Indiana. And I think there's a way of reading the record that isn't just, she's going to become a child in need of services, it's that the only purpose of the judicial proceeding is to determine not whether DCS is allowed to exercise control, legal custody over her, but to determine just specifically the medical interventions that are actually going to happen. A chintz proceeding is not like a criminal proceeding where everyone understands at some very basic level, everyone has a law and order understanding of what the proceeding looks like. Obviously this- Can I ask you to fill in the record a little bit more? Just do the best you can. Of course. All right? Okay. I thought that one of the named defendants here, Ms. Garrett, okay, explained that we're going to go file this paperwork, the chintz proceeding. There's going to be a hearing. At one point even said, you can present your case and you can get a lawyer. Now things got expedited from there, correct? I think the record reflects that toward the outset of this conversation she said JJ would become a child. And all this went down over the course of the same day, did it not? Was it September 22? This conversation was on September 21st. The follow-up conversations on September 22nd were you have to have her there. And that night of the 21st they said, hey, we're going to court the next morning, right? You can avoid that by going to get the blood draw. Your Honor, I think certainly they referenced filing something in court, but I don't think that contradicts the fact that they told the Jurgers, you have to do this. First of all, that's in the record. You have to take her for the blood draw. They told her, they told them she will become a child in need of services. When the Jurgers specifically asked for time to consult with an attorney, they said no, you don't have time for that. You have to have her there tonight. The record reflects that the Jurgers specifically asked for that time. And then when the Jurgers followed the instructions, you have to have her there, you have to have her there this evening, they were met at the hospital by law enforcement. This is not what voluntary consent looks like in the same vein as DuPois and similar cases. When you say met by law enforcement, what does the record show with respect to what the police said to the parents and what the parents said to the police? The record does not reflect that there was anything other than police presence. It does not reflect oral interaction. When you say they met them at the hospital, they were waiting at the, what's the record, were they waiting at the door for them? Met them in the parking lot? What are we talking about? The record reflects from Ms. Jurger that they were standing right there to make sure that we went through it. At the door? Or at the lab, in the lab? What I think a fair reading of the record is, is that there was a, there was a tiny hallway that leads to one exam room and one exam room only. Mr. Jurger's testimony is they were standing right there at the end of our hallway, which is no bigger than this room, referencing the conference room that, um, that, that some memory, it might be wrong and very well could be wrong, but I have a memory that the, that Mr. Jurger, and I didn't think the police were there for us, but Mrs. definitely did. I don't think that, I don't think that's correct, Your Honor, at all. I think both the Jurgers testified the police are there to, to make sure we went through with it. I, I know there's reference in DCS's brief to Mr. Jurger saying they, they were at the end of a hallway. What the, what he actually testified to is they were, they were right there at the end of our hallway, which is no bigger than this conference room. And I understand the record also indicate, maybe from Mr. Jurger, that they watched the Jurgers get the draw done from the hallway and then they left immediately after this, this was completed. And, and, and your memory of the record may, may be better than mine on that front. But certainly when, when the record is, is viewed in the light most favorable to us, this court has to assume at present that law enforcement was there to make sure that they went, they went through, through with it. So Mr. Roe, is your, is your overarching point with this that, look, we've got some unresolved material questions of fact here. Is that, is that the broader point you're making? Certainly on the voluntariness of the consent, that the Jurgers' testimony differs markedly from, from Ms. Garrett's about their interactions. As I say, the, they were told repeatedly, you have to do this. When a government official says up, shows up and says you have to do this, that is not voluntary consent. That is not a safety plan similar to DuPuy. And quite frankly, if the Jurgers had voluntarily consented, then DCS would have walked out of there with, with, with a signed safety plan. That is every part of, every bit, bit as much an established procedure in Indiana as it was in Illinois. Can I get the benefit of your reaction to a different point? Of course. It's just shifting gears a little bit. It threw me off, still does, in the district court opinion, okay? The district court says on page 11, APP 11, all agree, I'm quoting, all agree that the court can analyze the plaintiff's 4th and 14th amendment claims together. What does that, what does that mean to you and what agreement was there? Judge, I don't think there was any, any agreement at all. I, I think much of the effort in the district court was spent litigating the reasonable suspicion question, which is, which certainly is the standard for the 14th amendment claim. Right, right. That's why I'm asking it because I don't, I didn't read your position at any point to be that the, that the substantive standards conflate to read, you, I, I took you to say that the 4th amendment, and we're talking about the child, JJ's 4th amendment rights, that's subject to a probable cause analysis. 4th amendment is quite clearly a probable cause. So does that make, does that statement, can you make any sense out of it? I mean, you litigated it. That's why I'm asking you. Sure. And, and, and, and I think I can, your honor, because DCS, because the primary issue in this case throughout has been consent and this court in DuPuy held, held that reasonable suspicion is relevant as to, to justify a threat to, to, to, to go to court, significant energy was spent in the district court litigating the reasonable suspicion standard. We have never abandoned what I think is quite clear as, as a matter of constitutional jurisprudence that the probable cause standard actually applies. DCS has advanced no argument that they can meet the probable cause standard. So there are two issues before this court, either of which is sufficient to require reversal. The first is whether there is a factual dispute over the voluntariness of the jurors' consent. And the second is whether DCS was justified, even if the record can be interpreted as saying, if you don't consent to this search, we're going to go to court and see what, see what a judge actually does. Whether DCS was justified in making that threat by virtue of the fact that they had reasonable suspicion. And the point we've made on, on, on that latter point is the reasonable suspicion question is not, were the jurors reluctant to place their daughter on Keppra? Of course they were. We concede that they were. The reasonable suspicion question is whether DCS's knowledge that they were not providing their daughter with the drugs as of mid-August, when Riley had their last communication with the jurors, gave them suspicion to believe that she was still not on the drugs on September 21st and 22nd, when the actual search took place. Under the best of circumstances, a month is a lengthy period of time to simply assume that nothing changed. But here, everyone was aware of this significant intervening event, the second opinion at Norton Hospital. Common sense tells you that one of three things happened at Norton Hospital. Either they said the exact same thing as Riley and the jurors ignored it, they said the same or similar thing as Riley and the jurors followed their advice, or they had a different plan of care altogether. Now, two and three are not child abuse by any stretch of the imagination, so the reasonable suspicion question simply has to be whether DCS had knowledge at its disposal that what happened at Norton was actually number one. There's nothing at the record to support that. Far from it, before they, we say compelled, they say consented, but before the search actually took place, they became aware of exactly what happened at Norton Hospital. When you say at Norton, you're talking about the prescription for Keppra? The second opinion that they received that caused them to fail and start giving their daughter the Keppra, which took place in September of that year. Now, this court in Hernandez, the Third Circuit in Croft, which I would argue, given the number of times this court has relied on that opinion, is tantamount to circuit precedent. Both of those cases dealt with issues where during the course of the investigation, welfare officials learned something that they did not know at the outset. This falls perfectly in line with that precedent, and as I say, the record reflects that DCS acknowledges it. Their own reporting says we had no reason to believe she was not taking the drugs. Thank you very much. Thank you. Mr. Rose? Mr. Robel. Good morning, Your Honor, and may it please the court, my name is Justin Robel, and I represent the state of Indiana, and here I represent the Department of Child Service caseworkers, Ms. Garrett and Ms. Blaise. The grant of qualified immunity should be sustained. The jurors have presented no case establishing that child welfare workers violate federal law by saying that they will start a legal action if parents refuse to consent to a test. Well, isn't that the question? Mr. Rose says they were told that not simply that a legal action would be begun, but that they would lose custody of their child, and then when challenged, he fell back to say, well, what they were really told was the result was foreordained in some way. My question is, do we have a material dispute about what the caseworker told them? We don't, Your Honor, and the district court here properly found by looking at the record, and especially their own statements where they qualified the statements he's relying on, that they understood this was a real hearing that was going to happen. The statement they keep relying on the most, that they would file a motion to kill and that JJ would become a child who needs the services, that wasn't even talking about the blood draw. That was talking about the rejecting the safety plan, which they did do, and when we talk about the blood draw, the only testimony later in her deposition was that I had to go now or they would file a motion to compel. I'm frustrated both by Mr. Rose's argument and by yours, because no one is quoting from the actual statements that were made or that were reported as being made. Could you perhaps go back to the actual statements? Well, what I just said was the actual statement from page 40 of the deposition. So on page 5 of the district court's order, which is at 6, the district court itself says, Layla asked what would happen if she did not sign the document, and Garrett replied that DCS would file a motion to compel and JJ would become a child in need of services, cites to Layla Depp at 40. And then Garrett seemed to add, the Jurgers would be able to, quote, make their case at Jurgers could speak to the court at 41. As you say, that's about the safety plan. But the precise language, it's a big difference between telling somebody that your child is going to become a child in need of services, which this court has seen far too much out of Indiana about, but it's a significant move to exercise control over, in this instance, the medical plan for a particular child. And I certainly agree it's a big move, but we don't know what that move will be. There's a whole hearing after even a finding of Chins to figure out what the proper disposition would be. We know how those proceedings work. The question is precisely what was told to the parents who don't know how the proceedings work, right? If they're told something like, we're going to go to court and your daughter will become a ward of the court and the following will happen, then it's very hard to call the consent voluntary. If they are told, if you don't do this, we are going to go to court and a judge will decide whether there has to be a blood sample, then it's easy to see how the consent is voluntary because it avoids that step. And I think we need to be sure which of these characterizations of what they were told is correct, and whether there's a material dispute about those characterizations. To that, on page 41, which the district court relies on, the language is that there would be a court hearing and we would speak as well. On page 44, the attorney- Why don't you go back to page 40 first, which everybody has been citing. 40, and I have the quote here, but not the whole page. It says that they would file a motion to compel and that JJ would become a child in need of services. So if you're a frantic parent who has enough problems anyway with an epileptic infant, and you're told your daughter would become a child in need of services, it's at best confusing if somebody starts also spouting, oh, there'd be court proceedings and everything. They're probably very distraught. And I don't have that page in front of me, but I believe the next line was, or something like that, where she was not sure of the exact language. Right. The next page- My daughter's going to become a child in need of services. That sounds scary if you're a parent. And if that's what was said, that would be scary. I understand, Your Honor. But on the next page, she talks- That's what she says was said. That she understood that it would be a hearing, that they would speak. On page 44, they're specifically asked- She probably doesn't know about burdens of proof, but if she's being told your child would become a child in need of services, and maybe there'd be a court proceeding where you could try to persuade the judge to give her back to you, that would be pretty alarming as well. Well, on page 44, the state's attorney asked whether or not it represented them that it was a foregone conclusion, and their answer to that was that they did not explain anything to us, so that they're- So they don't know. That they're assuming that's a foregone conclusion at most, I think. So, Mr. Rowland, let me ask you about the- So, it seems to me that we have a lot of confusion about what's going on factually here. I mean, you're hearing it right on down the bench here. How can we resolve a qualified immunity issue? We're not even sure what- We don't- We can't even agree upon what happened, right? And that's the classic case where you can't decide qualified- I mean, we can't measure a certain set of facts against clearly established law because we don't have the facts constant yet. Well- So how can we possibly award qualified immunity or affirm an award of qualified immunity? I agree generally with what Your Honor's saying, but I think here we have enough to know that they were told that there would be a real court hearing, that it was not a foregone conclusion. And when they were talking specifically about the blood draw- But you just said that they didn't know that when asked, is it a foregone conclusion? They just said nobody explained anything to them. Well, they weren't told it was a foregone conclusion. They were told it was a court hearing. Okay, so we analyze qualified immunity around reasonable suspicion, 14th Amendment, substantive due process, right? That's what we're talking about. How do we get there? How would you write the opinion? Well, we're not talking about their subjective belief. We're looking at the objective standard- objective overall. Agreed. How do you write the opinion? These statements- The record as a whole showed they understood that they would be giving- being given a legitimate choice to either consent- There you go. That's the issue.  I agree, Your Honor. If that were clear- Yes. Everything would be straightforward. But we keep asking, is that clear in this record, that there is no dispute about that? And I believe it is. And the district court thought it was. When we were talking about the blood draw directly on page 134, they say we never agreed agreed. We went to the hospital because they thought they were going to file in court to get the child. So why isn't the safer course? Say, hold a hearing. Let's figure out what happened as a matter of fact. District judge could make findings of fact. Once we know what happened as a matter of fact, we can then start to measure it legally. It's the state's position in the district courts from the opinion that there was enough here. That it was clear that even though they might have had preconceptions- I know, but we're reviewing the district court opinion, right? I know you won in the district court, in other words. We know you're the appellee. But Mr. Rose is quite ably saying, there's a lot of confusion here. Well, I think a lot of that confusion is from them ignoring several of those statements that make it clear that they understood this would be a court hearing and that they would get to present- I think what- look, if it was entirely one-sided, we'd know the outcome. It's not. That's the thing, is you have things pointing like that. Hence, the need for a hearing. Well, I don't know if we have things pointing like that or them clarifying their statements when pushed and getting them to say what they understood. One fact we're not talking about, which seems relevant to me, is that evening, when I think it's Ms. Garrett, you can correct me if I'm wrong. Ms. Garrett says, hey, we're heading to court in the morning. Well, she said we're going to file, yeah. They then head to the hospital. Correct. And then it was very clearly that it was a- So couldn't that dovetail with his reading that, yeah, you bet they felt coerced. Well, it was still an option. Sometimes when you tell them that the other option is going to be going to court, there's something inherently coercive in that. But that doesn't mean it's coercive to where it violates- Going to court where your child is going to become a ward of the state through this Chins proceeding. But we also have them understanding that it was a hearing where they would get to speak to and that the judge would be deciding, not Ms. Garrett. And I think that's what convinced the district court that we have enough here under a qualified immunity lens for there not to be a constitutional violation, or at least to protect these defendants, that they were trying their best- Can I get the benefit of your reaction to the same question? Fourth Amendment have anything to do with this? Well, we have consent here, and that's an exception to the warrant requirement to seize the blood. So I think if we didn't have, that's, I think, is where it fits in. We do need reasonable suspicion- Right, because you're talking about the parents. We don't measure the child's fourth rights under the Substantive Due Process Clause, right? Right. It's under the Fourth Amendment, but we have the parents consenting on behalf of- Fourth Amendment, there's no probable cause analysis anywhere. Well, because we have consent. The state is not saying that without consent we'd be able to just take this child's blood. We've made an agreement with the state. First, we offered them a safety plan- So your position is what? In these circumstances, without consent, you're going to get a warrant? Yeah, I believe that's true, that we would need a warrant from a judge. You're not arguing- I didn't see any reference to the circumstances were so exigent that we could just draw the blood. No, and we've not made that argument. Okay. Our argument has always been that we have consent here, and so we did not need probable cause. We needed reasonable suspicion under this court's opinion, saying that we need that to do a child safety welfare. And I think we certainly have that here, if you want me to go into the facts of that. But another point I'd like to make about the mischaracterizing of the record is they keep talking about the police being deployed by DCS, and the deposition of both the Yerger's show that's purely speculative. They were city police, not state police. They were in the hallway. They never spoke to them, according to Mr. Yerger. There's no reason to infer that they intended to force a blood draw. They said nothing. And I think the other surrounding circumstances of this case, where they did refuse so many other requests by Ms. Garrett, asking for a safety plan with multiple blood draws, and agreeing to continue the use of the Keppra. Since when is this Indiana Department the medical expert? I mean, it just seems wild to me that, you know, there's one hospital that thinks that this is the right drug for a very young child. There's this other, Zonisamide too, that it could have been. But also the CBD, which, you know, in retrospect, the FDA approved for this very sort of thing. And then another hospital says, yeah, you know, we think Keppra's a good idea too, but keep up the CBD solution. You know, for the state to come in and say, we know that here's the only way we can treat this unfortunate illness on the part of the child is pretty aggressive. I don't think that's a fair characterization of the record either. Because at the time of the initial report, we only have the neurology department at Riley Hospital saying that, you know, she'd been advised multiple times, three times by a doctor, I think twice by a nurse, and once by the social worker there, that this was necessary and important drugs. In that initial report, they said that she was seeking a second opinion, but that they had not reported back what they had learned, but said they planned to stay with Riley. And that's on page 29 of the appendix that at least creates an inference, a very strong inference that they didn't like what they got for the second opinion. And it planned at that point to continue to stay. Well, Riley could just be more convenient. I mean, there are all sorts of reasons. Maybe you don't want to be schlepping down to Louisville all the time. But they were choosing to stay with these doctors who kept repeatedly saying that the only way to protect your child was with the Keppra. They backed off that a day or two later. And then a doctor later decides that the Keppra isn't necessary after all, and is managing the illness in a different way. Correct. And since that, DCS has not made any efforts to ensure that the child was taking Keppra. They have, after a second neurologist said that that was fine, the state completely backed off. We're not rejecting the science. We're following what the doctor at the first hospital who made the report that creates a mandatory requirement for our State Department of Child Services to conduct the investigation. They relied on what they were learning from those experts. And they keep citing a part of the record where they say the central office supervisor said that they had no reason to suspect that the child was not getting the Keppra. But that came after the blood draw. So after the Jurgers had submitted to the one test that could confirm their claims that they had started giving the drug, even after months of not giving and before saying they were going to, then deciding after the fact that they weren't going to and not giving it two weeks later, only after they finally gave the blood draw does that statement come from the central office saying, at that point, they're working with us. We see that they've made the effort to show they're on the drug, so we have no reason to suspect they're not. If there are no other questions, the court should grant the, it should affirm the grant of summary judgment. Thank you. Thank you very much, counsel. The case is taken under advisement.